# Supreme Court of Texas

---

No. 22-0585

---

Texas Department of Transportation,

*Petitioner*,

v.

Mark Self and Birgit Self,

*Respondents*

---

On Petition for Review from the
Court of Appeals for the Second District of Texas

---

**Argued November 30, 2023**

JUSTICE BUSBY delivered the opinion of the Court.

Mark and Birgit Self sued the Texas Department of Transportation (TxDOT), among other defendants, for negligence and inverse condemnation after employees of a TxDOT subcontractor cut down trees on the Selfs' property outside the boundaries of the State's right-of-way easement. The court of appeals held that TxDOT's evidentiary plea to the jurisdiction failed on the negligence cause of action but should have been granted on the cause of action for inverse condemnation.

We disagree. As to negligence, the Selfs have not shown either that the subcontractor's employees were in TxDOT's paid service or that other TxDOT employees operated or used the motor-driven equipment that cut down the trees, as required to waive immunity under the Tort Claims Act. Regarding inverse condemnation, however, the Selfs have alleged and offered evidence that TxDOT intentionally directed the destruction of the trees as part of clearing the right-of-way for public use. We therefore reverse the court of appeals' judgment, render judgment dismissing the negligence cause of action, and remand the cause of action for inverse condemnation to the trial court for further proceedings.

## BACKGROUND

The Selfs own a tract of rural land that adjoins a portion of Farm-to-Market Road 677 in Montague County and extends to the centerline of that road. The State has a right-of-way easement that reaches fifty feet from the centerline of the road in each direction and thus burdens part of the Selfs' property. The Selfs' predecessors constructed a fence along the edge of the easement, but the Selfs hired a contractor to remove this decaying fence and construct a new fence. The Selfs offered evidence that they instructed the fence contractor to "set the fence two to three feet on [the Selfs'] side of the [right-of-way] easement" to preserve large trees that had grown along the original fence and allow "the trees and fence [to] be maintained." As a result, a strip of the Selfs' property two to three feet wide outside the new fence was not burdened by the State's right-of-way easement.

2

TxDOT started a highway maintenance project and, as part of that project, contracted with T.F.R. Enterprises, Inc. (TFR) to remove brush and trees from the right-of-way. Their contract provided that "[t]rees to be removed shall be marked by the State," either on the plans or with an X painted on the trunk, "PRIOR TO WORK BEING PERFORMED." After TxDOT expressed concern about TFR's ability to complete the project on time, TFR notified TxDOT that it would increase its production by "adding a separate tree removal crew." TFR subcontracted with Lyellco Inc. to remove the trees.

Following TxDOT's revised instruction to TFR to "clear everything between the fences," Lyellco workers cut all trees up to the Selfs' fence line. After the Selfs complained, an email between TxDOT employees acknowledged that a TxDOT inspector "did direct the contractor to cut the trees down, but they were on the state highway side of the fence."

The Selfs sent a letter to TxDOT and attached a survey they had obtained, which showed that twenty-eight oaks and elms with trunk diameters ranging from eighteen to thirty-nine inches were removed near their fence line—thirteen of which were wholly outside the State's right-of-way and seven of which were partly outside it. TxDOT indicated in its interrogatory answers that it conducted "no surveys . . . in association with this project" and "TxDOT is not aware of any communications with [the Selfs] prior to clearing or maintaining of trees or vegetation on this project."

The Selfs obtained multiple estimates of the cost to replace the twenty felled trees that had been located wholly or partly outside the

3

right-of-way with trees up to twenty inches in diameter (the largest commercially available), and they sought $251,000 from TxDOT to compensate them for this cost. TxDOT rejected their claim by letter, explaining that the Attorney General's Office investigated the matter and concluded that TxDOT committed no act of negligence.

The Selfs sued TxDOT, contractor TFR, and subcontractor Lyellco for removing trees from the Selfs' land. They alleged two causes of action against TxDOT: negligence and inverse condemnation.

TxDOT filed a plea to the jurisdiction asserting immunity from both causes of action. Regarding negligence, TxDOT argued that the Selfs had not shown a TxDOT employee negligently damaged the trees by operating or using motor-driven equipment. *See* TEX. CIV. PRAC. & REM. CODE § 101.021(1). The Selfs responded that sovereign immunity was waived because (1) the Lyellco employees who removed the trees were TxDOT "employees" within the meaning of Section 101.001, and (2) other TxDOT employees exercised such control over the motor-driven equipment used to remove the trees that they "operated or used" that equipment within the meaning of Section 101.021.

Turning to inverse condemnation, as relevant here, TxDOT conceded that it directed TFR to remove the trees up to the fence line but argued that the Selfs failed to offer evidence that TxDOT intended to have trees removed from property outside its right-of-way. TxDOT pointed to undisputed evidence that the trees were on the state highway side of the fence and that the fence was not located at the edge of the

4

right-of-way.[1]  The Selfs responded that TxDOT acted with sufficient intent by countermanding the contract and ordering its contractor to remove all trees up to the fence, and they pointed to the TxDOT employee's email acknowledging that a TxDOT inspector "did direct the contractor to cut the trees down."

The trial court denied TxDOT's plea to the jurisdiction, and the court of appeals affirmed in part and reversed in part.  As to the negligence cause of action, the court of appeals ultimately concluded there was a fact issue on whether the Texas Tort Claims Act waived immunity, holding: (1) the trial court erred in identifying a factual dispute regarding whether TxDOT operated or used motor-driven equipment under Section 101.021; but (2) the trial court correctly identified a fact issue about whether the Lyellco employees who did use the equipment were TxDOT "employees" under Section 101.001 rather than employees of an independent contractor.  683 S.W.3d 62, 73-88 (Tex. App.—Fort Worth 2022).  Regarding the cause of action for inverse condemnation, the court of appeals reversed the trial court's judgment and held there was no evidence that TxDOT intentionally destroyed the Selfs' property.  *See id.* at 88-91.  Both TxDOT and the Selfs filed petitions for review, which we granted.

---

[1] TxDOT also asserted that it thought the right-of-way ran to the fence line, but the evidence it cited does not support that assertion.  In any event, our inverse condemnation analysis would be no different if TxDOT had provided such evidence.

## ANALYSIS

Sovereign immunity protects the State and its agencies and subdivisions from suit and liability, *PHI, Inc. v. Tex. Juv. Just. Dep't*, 593 S.W.3d 296, 301 (Tex. 2019), thereby depriving trial courts of subject-matter jurisdiction over suits against them unless the State consents. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). Immunity is properly asserted in a plea to the jurisdiction, *id.* at 225-26, which "may challenge the pleadings, the existence of jurisdictional facts, or both." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). We review the grant or denial of a plea to the jurisdiction de novo, "determin[ing] whether the plaintiff's pleadings, construed in favor of the plaintiff, allege sufficient facts affirmatively demonstrating the court's jurisdiction to hear the case." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012). "If evidence central to the jurisdictional issue is submitted, it should be considered in ruling on the plea to the jurisdiction" as "[e]vidence submitted with the plea may rebut the pleadings and undermine [the] waiver of immunity." *Id.*

The parties' petitions present the following issues for our decision. In determining whether the Tort Claims Act waives TxDOT's immunity from the negligence cause of action, the first issue we must consider is whether the Lyellco employees are TxDOT "employees" as defined by Section 101.001 of the Civil Practice and Remedies Code. The second issue is whether other TxDOT employees "operated" or "used" the motor-driven equipment under Section 101.021 by exercising direct and mandatory control over its use. Regarding the cause of action for inverse

6

condemnation, the issue before us is whether there is some evidence that TxDOT acted with the required intent when it destroyed the Selfs' trees. We address each issue in turn.

## I. The Tort Claims Act does not waive immunity from the Selfs' negligence claim.

As relevant here, the Tort Claims Act waives a governmental unit's immunity from suit and makes it liable for "property damage . . . proximately caused by . . . the negligence of an employee acting within his scope of employment" if the damage "arises from the operation or use of . . . motor-driven equipment" and "the employee would be personally liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM. CODE § 101.021(1). The Selfs contend that their negligence claim falls within this waiver for two reasons.

### A. "Employee" under Section 101.001

First, the Selfs argue that the employees of subcontractor Lyellco who cut down the trees are TxDOT "employees" as defined by Section 101.001, and thus their use of motor-driven equipment to destroy the trees waives immunity under Section 101.021. Section 101.001(2) of the Texas Civil Practice and Remedies Code provides that

> "Employee" [1] means a person, including an officer or agent, who is in the paid service of a governmental unit by competent authority, but [2] does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control.

The court of appeals did not address the first part of the definition: whether the Lyellco employees were "in the paid service of a

7

governmental unit by competent authority." Rather, the court focused on the exclusions listed in the second part of the definition and evaluated whether the Lyellco employees fell into one of the excluded categories, concluding they did not. 683 S.W.3d at 81-88. In so doing, the court conducted the familiar employee-versus-independent-contractor analysis that Texas courts have long used in this and other legal contexts,[2] focusing on whether there was evidence that TxDOT exercised sufficient control over Lyellco's employees performing the tree removal that they should be considered "employees" of TxDOT. *See id.* In a footnote, the court observed that TxDOT had argued on rehearing that Lyellco employees were paid by TFR and thus were not in the "paid service of a governmental unit." The court concluded that TxDOT waived this argument by failing to raise it previously and thus declined to "address TxDOT's eleventh-hour issue." *Id.* at 86 n.7.

This last conclusion was error for two reasons. First, TxDOT's "paid service" argument was not waived and should have been considered. As subject-matter jurisdiction is never presumed and cannot be waived, *see Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443-44 (Tex. 1993), the issue can "'be raised for the first time on appeal by the parties or by the court,' [and] a court is *obliged* to ascertain that subject matter jurisdiction exists regardless of whether

_____

[2] *See, e.g.*, *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 865 (Tex. 2021); *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002); *City of Houston v. Ranjel*, 407 S.W.3d 880, 890-92 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Olivares v. Brown & Gay Eng'g, Inc.*, 401 S.W.3d 363, 377-78 (Tex. App.—Houston [14th Dist.] 2013), *aff'd*, 461 S.W.3d 117 (Tex. 2015); *EGBT Tex. Pipeline, L.P. v. Harris County Flood Control Dist.*, 176 S.W.3d 330, 336-38 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd).

the parties have questioned it." *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Loutzenhiser*, 140 S.W.3d 351, 358-59 (Tex. 2004) (citations omitted). Thus, an appellate court's review of a plea to the jurisdiction is not limited to the grounds set forth in the governmental unit's plea in the trial court. *Dallas Metrocare Servs. v. Juarez*, 420 S.W.3d 39, 41 (Tex. 2013) ("[A]n appellate court must consider all of a defendant's immunity arguments, whether the governmental entity raised other jurisdictional arguments in the trial court or none at all."); *see also Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95-96 (Tex. 2012).

Second, the first part of Section 101.001(2) defines "employee" as a person in the "paid service of a governmental unit by competent authority," and the second part then narrows that category with various exclusions. Under this definition, if the Lyellco employees were not in TxDOT's "paid service," they cannot qualify as TxDOT employees even if they do not fall within any of the exclusions. Accordingly, the court of appeals should have addressed the parties' dispute regarding "paid service." *See Harris County v. Dillard*, 883 S.W.2d 166, 167 (Tex. 1994) (holding because there was "no dispute that Skeen was not in the paid service of Harris County," he was "therefore not an 'employee', within the meaning of the Tort Claims Act," and not reaching the exclusions); *Marino v. Lenoir*, 526 S.W.3d 403, 406 (Tex. 2017) (concluding first that Lenoir was "in the paid service" of a governmental unit and then considering whether she was nonetheless excluded from the "employee" definition by one of the statute's exceptions).[3]

---

[3] *See also Maldonado v. City of Pearsall*, 977 F. Supp. 2d 646, 651-52 (W.D. Tex. 2013) ("[I]f a defendant fails to satisfy the 'paid employment' prong,

9

Turning to whether Lyellco's employees were in TxDOT's "paid service," TxDOT argues in its briefing for a strict "paycheck test": a requirement that the person receive payment directly from the governmental unit. At oral argument, however, TxDOT conceded that this test is too narrow. We agree and reject such a test.

One problem with a paycheck test is that the statute does not include the phrase "paid by a governmental unit." Instead, it uses the broader phrase "in the paid service of a governmental unit by competent authority." That choice of words must be given meaning. Additionally, the definition specifically excludes independent contractors, agents or employees of independent contractors, and persons who perform tasks the details of which the governmental unit does not have the legal right to control. Many of these excluded persons and entities—for example, employees of independent contractors—would not receive a paycheck directly from the governmental unit. But excluding employees of independent contractors in the second part of the definition indicates that they could fall under the "paid service" umbrella of the first part. Thus, a strict "paycheck test" would render this exclusion superfluous. Relatedly, the phrase "by competent authority" indicates that some person or entity other than the governmental unit itself can be made competent—perhaps by law or contract—to place others in the unit's paid service. This phrase must likewise be given meaning.

A paycheck test would also be subject to easy manipulation in a manner inconsistent with the concepts that the Legislature concluded

---

a court need not address whether the governmental unit had the right to control the details of his assigned tasks.").

10

should be the focus of whether immunity is waived, including control and negligent operation of motor-driven equipment. *See* TEX. CIV. PRAC. & REM. CODE §§ 101.001(2), 101.021(1). As long as a governmental unit took steps to ensure its employees' paychecks did not come *directly* from the unit, its immunity would not be waived under a paycheck test regardless of how much control it exerted over their negligent operation of motor-driven equipment.

Moreover, the cases cited by TxDOT (1) stand for the limited proposition that "paid service" excludes unpaid volunteers, which we do not have in this case, and (2) themselves indicate that "paid service" has a broader meaning than the paycheck test. For example, in *Harris County v. Dillard*, we held that "a *volunteer* reserve deputy subject to being called into service" but who had not been called into service "was not in the paid service of Harris County at the time of the accident." 883 S.W.2d at 167 (emphasis added). And in *Murk v. Scheele*, we similarly held that a University of Texas medical student was not in the paid service of the university because he received no monetary benefit other than medical professional liability insurance coverage. 120 S.W.3d 865, 867 (Tex. 2003). *Murk* indicates that the question is instead whether "part of" the person's compensation "was *ultimately* paid by" the governmental unit, *id.* (emphasis added), which suggests that direct payment from the unit is not necessary to paid service.

As discussed below, the facts of this case do not require us to define the precise contours of what constitutes "paid service." But the parties identify some cases from our courts of appeals that have addressed whether particular people meet this statutory requirement

11

when they do not receive payment directly from a governmental unit, as well as cases that have addressed similar issues in other legal contexts.

For example, two courts have held that workers are in the paid service of a governmental unit when the unit pays them through a staffing company based on timesheets they submit or when a contractor bills the unit for reimbursement of the workers' wages.[4]  TxDOT also cites a case addressing when an entity is an employer under the Labor Code, arguing that this can be a helpful analogy in defining paid service under the Tort Claims Act.  *See Risk Mgmt. Strategies, Inc. v. Tex. Workforce Comm'n*, 464 S.W.3d 864, 871-73 (Tex. App.—Austin 2015, pet. dism'd) (holding trusts employed caregivers when management company paid their wages and processed payroll but trusts reimbursed company for their services).  In *City of Bellaire v. Johnson*, for instance, we concluded that a worker was "a person in the service of a political subdivision who has been employed as provided by law"[5] for purposes of workers' compensation coverage because he "was paid by the City through [a staffing company], and on the basis of the hours he reported to the City."  400 S.W.3d 922, 923 (Tex. 2013).

We do not endorse using any of these approaches to define "paid service" in Section 101.001(2) today, as doing so is not necessary to decide this case.  Instead, we simply note that these authorities may

---

[4] *See Nickerson v. Pineda*, No. 13-17-00346-CV, 2019 WL 2041774, at *4 (Tex. App.—Corpus Christi–Edinburg May 9, 2019, pet. denied) (staffing company); *Miers v. Tex. A&M Univ. Sys. Health Sci. Ctr.*, 311 S.W.3d 577, 580-81 (Tex. App.—Waco 2009, no pet.) (reimbursement).

[5] TEX. LAB. CODE § 504.001(2).

12

provide a useful starting point as courts and litigants attempt to develop a more comprehensive test for "paid service" in future cases.

Here, the relationship between TxDOT and Lyellco's employees is far removed from the kinds of payment relationships that courts have concluded amounts to paid service. TxDOT did not have any contractual relationship with subcontractor Lyellco, which was retained by TxDOT's contractor TFR. And the TFR–Lyellco subcontract specifies that "the payment provisions of the Contract between [TxDOT] and [TFR] are not a part of this Subcontract and specifically are not incorporated by reference." Indeed, the record indicates that TxDOT paid TFR for tree removal services on a per-tree basis, while TFR paid Lyellco on a per-day basis.[6] There is no indication that these prices were substantially similar. Nor is there any indication that TxDOT made payments that "flowed through" TFR and Lyellco to Lyellco's employees to compensate them for their work, that TxDOT had any role in determining how much Lyellco's employees were paid, that any payment by TxDOT was a prerequisite to TFR's obligation to pay Lyellco or Lyellco's obligation to pay its employees, or that TxDOT had any reimbursement obligation regarding subcontracted labor.

---

[6] More specifically, TxDOT paid TFR for tree removal based on "unit pricing"—that is, a per-tree price based on each tree's diameter. The total contract price was $335,907.50, subject to TxDOT-approved adjustments for "additional trees to be removed (not on plans)." After TFR hired Lyellco to conduct tree removal, Lyellco obtained payment by presenting TFR with "an invoice every Monday for all Work performed and completed through the previous week." The record contains an invoice from Lyellco to TFR for "Tree Removal" performed on July 20 through 24, with the amount due calculated by multiplying a base rate of $1,500 per day by the number of work days.

For these reasons, we hold that Lyellco's employees were not in TxDOT's paid service as required by Section 101.001(2), and therefore they are not TxDOT employees whose operation or use of motor-driven equipment could provide the basis for a waiver of immunity under Section 101.021 of the Tort Claims Act. Because we hold that Lyellco's employees were not in TxDOT's paid service, we do not address whether those employees fall within one of Section 101.001(2)'s exclusions.

### B.  "Operation or use" under Section 101.021

The Selfs next argue that even if Lyellco's employees who cut down the Selfs' trees do not qualify as employees in TxDOT's paid service, immunity is waived under Section 101.021 because other TxDOT employees "operated" or "used" the motor-driven equipment that cut down the trees by exercising direct and mandatory control over its use. In reviewing this argument, we apply our conclusion in *LeLeaux v. Hamshire-Fannett Independent School District* that a governmental unit's employee must negligently operate or use the motor-driven equipment to satisfy this immunity waiver. 835 S.W.2d 49, 51 (Tex. 1992).

As noted above, Section 101.021(1) requires that the property damage be caused by the employee's negligence and that it arise from the operation or use of a motor-driven vehicle or piece of equipment. We explained in *LeLeaux* that the statutory phrase

> "arises from", requires a nexus between the injury negligently caused by a governmental employee and the operation or use of a motor-driven vehicle or piece of equipment. While the statute does not specify whose operation or use is necessary—the employee's, the person who suffers injury, or some third party—we think the more

14

> plausible reading is that the required operation or use is that of the employee. This requirement is consistent with the clear intent of the Act that the waiver of sovereign immunity be limited.

*Id.*

But as the court of appeals explained in detail, there is a split in authority on what it means for a government employee to "operat[e] or use" a motor-driven vehicle or equipment as required by *LeLeaux*. Must the employee be physically manning the controls of the vehicle or equipment to "operate" or "use" it, or is it sufficient if the employee exercises direct and mandatory control over the person at the controls? The courts of appeals in *County of Galveston v. Morgan*, 882 S.W.2d 485 (Tex. App.—Houston [14th Dist.] 1994, writ denied), and *City of El Campo v. Rubio*, 980 S.W.2d 943 (Tex. App.—Corpus Christi–Edinburg 1998, pet. dism'd w.o.j.), held that an employee of a governmental unit can exercise such direct and mandatory control over motor-driven vehicles or equipment that even though a private third party is physically at the controls, the employee is operating or using the equipment for purposes of Section 101.021.

*Morgan* involved a dump truck that contacted an electrical line. The truck's driver was an employee of a third-party contractor, but county employees acted as spotters who told the driver when to move forward and when to stop. *Morgan* reasoned:

> There is no requirement [in Section 101.021] that the vehicle in question be a county vehicle, only that a county employee "used" or "operated" the vehicle. [*LeLeaux*, 835 S.W.2d at 51.] "Operation" refers to "a doing or performing of a practical work," and "use" means "to put or bring into action or service; to employ for or apply to a given purpose."

15

[*Id.*] The spotters in question were county employees. They were a necessary part of the job. The spotters told the truck driver when to move forward, how far to move, when to raise his bed, how far to raise it, when to lower his bed, and when to stop. The movement of the truck and the laying of the gypsum was within the spotters' sole discretion. If a driver moved his truck contrary to the spotters' direction, he could be fired. Although the spotters were not the drivers of the trucks, the spotters "used or operated" the trucks by exercising complete control over their "use or operation."

882 S.W.2d at 490.

*Rubio* involved a police officer who arrested a driver for driving with a suspended license. After arresting the driver, the officer ordered the driver's wife, who was not a licensed driver, to follow him in the family's vehicle to the police station and allegedly showed the wife how to operate the vehicle by demonstrating the use of the gas and brake pedals. When the officer pulled onto the highway, the wife followed him as ordered and was struck by another car. Noting that *LeLeaux* defined "use" broadly to include "bring into action" or "apply to a given purpose," 980 S.W.2d at 946, the court concluded that the officer used the family's vehicle. *Id.* at 947.

Other courts of appeals have declined to follow *Morgan* and *Rubio*, requiring instead that the government employee physically use the motor-driven equipment to trigger Section 101.021's waiver. *See* 683 S.W.3d at 75-80 (collecting cases). Because it is undisputed that employees of Lyellco—not TxDOT—physically used the motor-driven equipment to remove the trees, TxDOT would retain its immunity under this line of cases.

16

This split may be a manifestation of the tension the Selfs identify between *LeLeaux*'s reading of the statute and its plain text, which as *LeLeaux* acknowledges does not expressly require the employee to use or operate the motor-driven equipment. In *PHI, Inc. v. Texas Juvenile Justice Department*, we recently explained that it was error for the court of appeals to require that a government employee be actively operating the vehicle at the time of the incident, as "no court has the authority, under the guise of interpreting a statute, to engraft extra-statutory requirements not found in a statute's text." 593 S.W.3d at 305.

As with the "paid service" issue, however, the facts of this case do not require us to resolve the split. As the court of appeals observed, the actions of TxDOT's employees did not rise to the level of control that cases like *Morgan* and *Rubio* determined was sufficient to create a fact question on whether they were operating or using the equipment. *See* 683 S.W.3d at 80-81. The record indicates that TxDOT gave instructions to TFR to clear trees beside the highway within certain parameters. TFR then contracted with Lyellco to have Lyellco employees physically remove the trees. These facts are not analogous to *Morgan* and *Rubio*, which involved very precise direction by a government employee in close physical proximity to the equipment being operated.

For these reasons, we hold that the Tort Claims Act does not waive immunity for the Selfs' negligence claim. Accordingly, the court of appeals erred in affirming the trial court's order denying TxDOT's plea to the jurisdiction regarding that cause of action, which must be dismissed.

17

## II. Evidence that TxDOT intentionally directed the trees' destruction supports the Selfs' claim for inverse condemnation.

The Selfs also brought a cause of action against TxDOT seeking compensation for inverse condemnation under Article I, Section 17 of the Texas Constitution. The Selfs alleged that TxDOT and its agents lacked "authority" or "consent" to enter the Selfs' property outside the right-of-way and that their acts in directing and implementing the removal of trees outside the right-of-way were "physical" and "intentional." The Selfs also offered evidence that a TxDOT inspector "did direct the contractor to cut the trees down." But TxDOT responded, and the court of appeals held, that the record "does not contain evidence . . . that TxDOT acted with the requisite intent to support an inverse-condemnation claim." 683 S.W.3d at 88. To determine which position is correct, we begin by examining the nature and requirements of a claim for inverse condemnation.

"The protection of one's right to own property is said to be one of the most important purposes of government. That right has been described as fundamental, natural, inherent, inalienable, not derived from the legislature and as preexisting even constitutions." *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977). The Texas Constitution helps ensure that government fulfills this purpose by providing a robust right to adequate compensation—and waiver of immunity—if a person's property is "taken, damaged, or destroyed for or applied to public use . . . unless by the consent of such person." TEX. CONST. art. I, § 17(a); *see Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980). Our Takings Clause protects against more types of government action than its federal

18

counterpart,[7] as it contains the additional verbs "damaged," "destroyed," and "applied"—each of which creates a claim with its own distinct scope. *See City of Dallas v. Jennings*, 142 S.W.3d 310, 313 n.2 (Tex. 2004); *Steele*, 603 S.W.3d at 789-791.[8]

"When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation." *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004).[9]  The elements of an inverse condemnation or "takings" claim are that (1) an entity with eminent domain power intentionally performed certain acts (2) that resulted in taking, damaging, or destroying the property for, or applying it to, (3) public use.  *See, e.g.*, *Sw. Bell Tel., L.P. v. Harris County Toll Rd. Auth.*, 282 S.W.3d 59, 62 (Tex. 2009); *Gen. Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001).[10]

---

[7] U.S. CONST. amend. V ("nor shall private property be taken for public use, without just compensation").

[8] *See also City of Baytown v. Schrock*, 645 S.W.3d 174, 182-84 (Tex. 2022) (Young, J., concurring); *Jim Olive Photography v. Univ. of Houston Sys.*, 624 S.W.3d 764, 780-82 (Tex. 2021) (Busby, J., concurring).

[9] The action is "inverse" because an entity with the power of eminent domain has not filed a statutory condemnation action to determine adequate compensation before taking the property, so the owner initiates an action for compensation under the Constitution.  *See City of Dallas v. Stewart*, 361 S.W.3d 562, 567 (Tex. 2012).

[10] Because takings that are threatened or completed for non-public purposes are unlawful, property owners may obtain injunctive relief to prevent or undo such takings.  *Jim Olive Photography*, 624 S.W.3d at 781-82 (Busby, J., concurring) (citing *McCammon & Lang Lumber Co. v. Trinity & B.V. Ry. Co.*, 133 S.W. 247, 248 (Tex. 1911)).

Although the Constitution does not expressly require an intentional act, we have explained that such a requirement helps ensure that the taking is for "public use." *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 820-21 (Tex. 2009).[11] An intentional act satisfying the first element requires evidence that the entity either (a) "intended to damage the property" or (b) "kn[ew] that [its conduct was] causing identifiable harm" or that "specific property damage [was] substantially certain to result from [the conduct]." *Jennings*, 142 S.W.3d at 313-14.[12] We explore these two *Jennings* standards for proving intent in more detail below.

If a defendant files a plea to the jurisdiction showing that the plaintiff has not alleged these elements and cannot amend its petition to do so, or if the defendant negates an element in an evidentiary plea, the takings claim must be dismissed. *See City of Houston v. Carlson*,

---

[11] This requirement applies to both physical and regulatory takings. For regulatory takings, the intentional acts are typically the passage of a law or regulation or its actual or threatened application to the plaintiff's property. *See Lowenberg v. City of Dallas*, 168 S.W.3d 800, 802 (Tex. 2005); *City of Houston v. Maguire Oil Co.*, 342 S.W.3d 726, 742 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

[12] In *Jennings*, we rejected the government's argument that it "must *necessarily* intend to cause the damage," recognizing that proof of knowledge that the damage was "substantially certain to result" would also be sufficient. 142 S.W.3d at 314 (emphasis added). *See also Schrock*, 645 S.W.3d at 178 ("A plaintiff must show that the government intended to or was substantially certain that its actions would take or damage the property for public use."); *Harris County Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016) ("Generally, plaintiffs seeking recovery for a taking must prove the government 'intentionally took or damaged their property . . . or was substantially certain that would be the result." (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 808 (Tex. 2005))); *Gragg*, 151 S.W.3d at 555.

451 S.W.3d 828, 830 (Tex. 2014); *Miranda*, 133 S.W.3d at 226-28. Although the fact-finder may need to "resolve disputed facts regarding the extent of the governmental intrusion on the property, the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998).

Here, the Selfs alleged and the evidence shows that TxDOT intended to damage the property: a TxDOT employee expressly directed TxDOT's agents to cut down the trees at issue, and it is undisputed at this stage that doing so destroyed the Selfs' personal property. The Selfs owned the land on which the trees stood—and thus the trees themselves—both within and outside TxDOT's right-of-way easement. And their survey shows that at least twenty of the felled trees were wholly or partially outside the easement, so TxDOT cannot rely on that easement to show consent. In addition, the record contains ample evidence—including TxDOT's contract with TFR—that TxDOT directed the trees' destruction as part of exercising its authority to maintain the highway right-of-way for public use.[13] That is all the plain text of Article

---

[13] As to the first element, one court of appeals has suggested that the intentional act itself must be a proper exercise of the government's lawful authority. *City of Webster v. Hunnicutt*, 650 S.W.3d 792, 798 (Tex. App.—Houston [14th Dist.] 2022, pet. denied). But we have not so held. Rather, we also consider the context in which the act occurred, examining whether it is part of a project that the government has legal authority to undertake for public use—the third element. *See State v. Hale*, 146 S.W.2d 731, 736 (Tex. 1941) ("The true test is, did the State intentionally perform certain acts in the exercise of its lawful authority to construct such highway for public use which resulted in the taking or damaging of plaintiffs' property . . . ."); *see also Steele*, 603 S.W.2d at 791.

I, Section 17 and our precedents require to maintain a constitutional claim of compensation for inverse condemnation.

We have recognized certain defenses to and exceptions from liability for inverse condemnation, but none apply here. For example, although we have "refus[ed] to differentiate between an exercise of police power, which excused compensation, and eminent domain, which required compensation,"[14] we have taken into account historical limitations on private property rights, holding that the government may prove as a defense to compensation that it was abating a condition found by a court to be a public nuisance[15] or was acting upon "great public necessity," such as conflagration or war.[16] In addition, we have explained that the government's exercise of express constitutional powers inconsistent with compensation—such as the power to tax—does not constitute a taking,[17] and Article I, Section 17 itself recognizes the owner's "consent" as a defense. Similarly, no compensation is owed

---

[14] *Steele*, 603 S.W.2d at 789 (observing that this "dichotomy . . . has not proved helpful in determining when private citizens affected by governmental actions must be compensated"); *see also Travelers' Ins. Co. v. Marshall*, 76 S.W.2d 1007, 1009-1011 (Tex. 1934) (rejecting argument that government has authority "under the police power" to act contrary to the "rights, guaranties, privileges, and restraints" in the Bill of Rights, which are expressly "excepted out of the general powers of government" by Article I, Section 29).

[15] *Stewart*, 361 S.W.3d at 569; *City of Texarkana v. Reagan*, 247 S.W. 816, 817-18 (Tex. 1923).

[16] *Steele*, 603 S.W.2d at 792; *see also Baker v. City of McKinney*, 84 F.4th 378, 385-88 (5th Cir. 2023) (examining historical basis for necessity defense).

[17] *See Norris v. City of Waco*, 57 Tex. 635, 643 (1882).

when the government acts on its rights under a contract to which the parties have consented because it is not exercising sovereign powers.[18]

We have also held that "mere negligence which eventually contributes to the destruction of property is not a taking"; it is a negligence claim on which the government is immune from suit absent a waiver. *City of Tyler v. Likes*, 962 S.W.2d 489, 504-05 (Tex. 1997). In contrast, as explained above, the Selfs have alleged and offered evidence here that TxDOT is liable for adequate compensation because it "intentionally perform[ed] certain acts in the exercise of its lawful authority to [maintain the] highway for public use which resulted in the taking or damaging of [their] property." *State v. Hale*, 146 S.W.2d 731, 736 (Tex. 1941).[19]

The court of appeals and TxDOT make two points in opposition to this conclusion. Neither withstands scrutiny.

**First**, the court of appeals concluded that TxDOT's intent should be assessed under the second standard we announced in *Jennings*. *See* 683 S.W.3d at 89-90 (citing *Jennings*, 142 S.W.3d at 314). We disagree. Applying the second *Jennings* standard is unnecessary in cases where, as here, the intentional conduct of government agents is itself a taking,

---

[18] *Little–Tex Insulation Co.*, 39 S.W.3d at 598-99; *City of Anson v. Harper*, 216 S.W.3d 384, 392 (Tex. App.—Eastland 2006, no pet.) ("[W]hen the State acts as a party to a contract and exercises the same rights as would a private party, it is not acting as a sovereign, and a takings claim does not lie."); *but cf. Harrison v. City of Sulphur Springs*, 67 S.W. 515, 516 (Tex. Civ. App.—Dallas 1902, no writ) (rejecting city's argument of contractual consent to physical taking of drainage channel because contract was not with property's true owner).

[19] *See also Kerr*, 499 S.W.3d at 800 n.17 (quoting *Hale*, 146 S.W.2d at 736).

23

damaging, destruction, or appropriation of property. Such conduct satisfies the first *Jennings* standard: that the government "intend[ed] to cause the damage." 142 S.W.3d at 314.

"[W]e have sought objective indicia of intent in particular contexts to determine whether property has been taken or damaged in furtherance of the public interest." *Gragg*, 151 S.W.3d at 555. This Court identified such a context in *Jennings*: cases in which the government's intentional conduct is not itself a physical taking, damaging, or destruction of property but the conduct initiates a chain of events that "eventually contributes to" such harm. 142 S.W.3d at 313.[20] In that context, the property owner must show that the government (1) engaged in an affirmative act or course of conduct that resulted in the physical taking, damaging, destruction, or application of property; and (2) did so with the necessary intent under the second *Jennings* standard—that is, with knowledge that either the conduct was causing identifiable harm or specific property damage was substantially certain to result. *Id.* at 314; *see also Harris County Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799-800 (Tex. 2016).

These requirements ensure that when there is a causal chain linking the intentional government conduct to the eventual property

_____

[20] *See Jennings*, 142 S.W.3d at 314 (addressing cases in which the government "did not particularly desire [or intend for] the property to be damaged" but damage was "incident to" or "a consequential result of" the government's intentional act); *Koch v. Tex. Gen. Land Off.*, 273 S.W.3d 451, 459 (Tex. App.—Austin 2008, pet. denied) ("[T]he cases in which the [second] *Jennings* intent standard has been applied involve circumstances in which the governmental entity's intentional act is not the actual physical taking or damaging of property, but rather the cause of a physical taking or damaging of property.").

24

damage, that damage occurred for "public use" because the government was aware harm was substantially certain "and yet determine[d] that the benefit to the public outweigh[ed]" it. *Jennings*, 142 S.W.3d at 314; *see also Kerr*, 499 S.W.3d at 806-07.[21] The *Jennings* standards also help to draw the line between takings claims and negligence claims against the government—which, as discussed above, are generally barred by immunity unless a waiver applies. *See Gragg*, 151 S.W.3d at 554.

Unlike the facts at issue in *Jennings*, this case does not present a context in which the government's intentional conduct initiated a chain of events that ultimately resulted in a taking of private property. Here, TxDOT employees intended to physically destroy the trees for a public use and directly ordered TxDOT's agents to cut them down, which they did. This intentional government conduct was not the *cause* of an eventual taking—it *was* the taking. The second *Jennings* intent standard serves no purpose in such cases.[22] By applying that standard

---

[21] Several of our cases provide additional examples of causal-chain scenarios in which the second *Jennings* standard is used to determine intent. *See, e.g.*, *Kerr*, 499 S.W.3d at 796-97 (applying standard when county's approval of "'unmitigated' upstream development, combined with a failure to fully implement [a previously approved flood-control plan]," ultimately caused flooding of plaintiffs' homes); *Gragg*, 151 S.W.3d at 549 (applying standard when construction and operation of water reservoir caused significant change in flooding characteristics resulting in damage to plaintiff's ranch); *Jennings*, 142 S.W.3d at 313 (applying standard when city's unclogging of public sewer led to sewage flooding plaintiffs' home).

[22] *Koch*, 273 S.W.3d at 459 (holding second *Jennings* standard inapplicable when "the intentional act alleged is the physical taking and dominion over the property at issue"); *City of Anson*, 216 S.W.3d at 393 ("[U]nlike *Jennings*, this is not an attenuated claim based upon unhappy circumstance. Plaintiffs' claim [for physical damage to their mineral estate] is the direct result of the City's dirt work."); *see also Maguire Oil Co.*, 342 S.W.3d

here, the court of appeals chose the wrong focus for its analysis of intent, which contributed to another error that we discuss next.

**Second**, the court of appeals held the Selfs were required to prove "that TxDOT intended to cut down those of the Selfs' trees beyond the right-of-way" and they failed to do so, as TxDOT simply "assumed trees on the road side of the fence were in the right-of-way." 683 S.W.3d at 90. Focusing on what it called the "impetus of" TxDOT's intentional act, the court saw "no evidence that TxDOT had any inkling that it was damaging the Selfs' trees when the area up to their fence was cleared." *Id.* at 91. TxDOT doubles down on this position in our Court, arguing that it believed its instruction to clear trees between the fences would ensure those trees were within its right-of-way easement. In TxDOT's view, no compensation is owed because the Selfs cannot show it "knew that the trees at issue were . . . [not] in the right of way."

Many Texas and federal courts have rejected such arguments,[23] and we join them in holding that the Constitution means what it says: the government must pay compensation when it intentionally takes private property for public use—even if the government mistakenly believes that it has a legal right to do so apart from its power of eminent domain. Of course, a takings claim will fail if the government's belief turns out to be correct. But the court of appeals' approach would allow the government to escape liability for inverse condemnation merely by

---

at 741-43 (holding second *Jennings* standard inapplicable to regulatory taking given evidence of city's intentional enforcement of ordinance); *City of San Antonio v. El Dorado Amusement Co.*, 195 S.W.3d 238, 245 (Tex. App.—San Antonio 2006, pet. denied) (same given intentional approval of rezoning).

[23] *See, e.g., infra* notes 25-27.

*asserting* that it owns or has rights to—or thought at the time of the taking that it owned or had rights to—property it intentionally took, damaged, destroyed, or appropriated for public use. That position finds no support in the text of Article I, Section 17, is contrary to precedent, and would "permit government to escape its constitutional duty to compensate its citizens for destruction of their property." *Hansen v. United States*, 65 Fed. Cl. 76, 81 (2005).

The words of our Takings Clause do not remotely suggest that a property owner must prove the government had a particular "impetus" or mindset regarding whether its intentional taking of property for public use was permissible. When the government wishes to take property in which it has no rights, it need only exercise its power of eminent domain by initiating a condemnation action and paying compensation. The point of a constitutional action for inverse condemnation is to allow private property owners to obtain compensation for other intentional government conduct that takes, damages, destroys, or appropriates their property for public use without any valid legal basis other than eminent domain. *See Labruzzo v. United States*, 144 Fed. Cl. 456, 473 (2019).

Nor do the "public use" element or the need to distinguish between negligence and takings claims impel us to demand proof that TxDOT acted in bad faith—that is, with subjective awareness that it had no legal right to cut down the Selfs' trees. As discussed above, these considerations are already served by *Jennings*' requirement that the property owner prove intentional government conduct that either is a taking itself or that the government knows is substantially certain to

27

result in a taking. And here, the Selfs have alleged and offered evidence that TxDOT's intentional conduct was itself a taking: it expressly directed the trees' destruction as part of clearing the right-of-way for public use. Nothing more is necessary.

For these reasons, "[w]e are not persuaded that the State's subjective belief regarding its title to [or rights in] property, by itself, changes or dictates the capacity in which the State acts. . . . [A]bsent . . . a determination" that "the State is, in fact, the property owner" or has other rights in the property, "the State's intentional act of taking property for public use is an exercise of its eminent domain powers" that requires compensation. *Koch v. Tex. Gen. Land Off.*, 273 S.W.3d 451, 458 (Tex. App.—Austin 2008, pet. denied). As we explained in *City of Dallas v. Stewart*, although a government entity "commits no taking when it abates what is, in fact, a public nuisance" as determined by a court, the government cannot avoid paying compensation based simply on its own declaration that the property is a nuisance. 361 S.W.3d 562, 569-570 (Tex. 2012). Thus, "[w]hether the [government] acted in good faith in physically [taking] the [property,] or believed that [doing so] was not a 'taking' of property as a constitutional matter, has no impact on whether [its] act in taking the [property] was intentional." *Koch*, 273 S.W.3d at 460.[24]

This view—that the government must pay compensation when it intentionally destroys private property for public use with the mistaken

---

[24] In other words, "[w]hat matters is not whether the [government] intended to violate a private property right. Rather, the requisite intent is whether the [government] intended its physical [taking]." *Labruzzo*, 144 Fed. Cl. at 474.

belief that it has a legal right to do so—is widely shared among Texas and federal courts. Whether the claim is for a physical taking[25] or a regulatory taking,[26] and whether the owner alleges that the

---

[25] *See, e.g.*, *Glade v. Dietert*, 295 S.W.2d 642, 643, 646-47 (Tex. 1956) (concluding owner could obtain compensation for trees removed from property, either by separate action or in subsequent condemnation proceeding, where city "by inadvertence had failed to acquire the necessary additional . . . right of way"); *State v. BP Am. Prod. Co.*, 290 S.W.3d 345, 364-66 (Tex. App.—Austin 2009, pet. denied) (concluding owner alleged takings claim based on State's intentional leasing of minerals to third party notwithstanding State's assertion of ownership); *City of Dallas v. VSC, LLC*, 242 S.W.3d 584, 593 (Tex. App.—Dallas 2008) ("The City misreads *Little–Tex Insulation Co.* as requiring, for a takings claim, that the government intend to act under its eminent domain power."), *rev'd on other grounds*, 347 S.W.3d 231 (Tex. 2011); *Koch*, 273 S.W.3d at 458 (rejecting argument that government mineral owner's claim of title to disputed materials it removed from property of plaintiff surface owner established lack of intent for takings claim); *Porretto v. Patterson*, 251 S.W.3d 701, 708 (Tex. App.—Houston [1st Dist.] 2007, no pet.] (denying plea to jurisdiction on physical takings claim where government asserted ownership of private land and leased it to third party but later abandoned its assertion and explaining that government cannot "claim immunity for a taking by simply asserting title"); *City of Anson*, 216 S.W.3d at 391 (holding mineral owner's allegations and evidence established potential claim for damage caused by city's surface work despite city's contention it was acting under its surface ownership rights); *Kenedy Mem'l Found. v. Mauro*, 921 S.W.2d 278, 281-82 (Tex. App.—Corpus Christi–Edinburg 1995, writ denied) (holding inverse condemnation claim survived jurisdictional plea despite State's assertion of title where foundation alleged that state mineral leases encroached on foundation's property); *Harrison*, 67 S.W. at 516 (concluding city took private property by digging drainage channel where person from whom city obtained consent proved not to be owner).

[26] *See, e.g.*, *Maguire Oil Co.*, 342 S.W.3d at 743 ("[A] viable [regulatory] inverse condemnation claim can be predicated on the City's intentional but erroneous enforcement of an ordinance that interferes with permissible activity by the targeted entity."); *Barto Watson, Inc. v. City of Houston*, 998 S.W.2d 637, 641-42 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (allowing regulatory takings claim where city inspector improperly enforced permit requirement to shut down sand pit that city later allowed to reopen).

government's intentional conduct was itself the taking or that the government knew its conduct was substantially certain to result in a taking,[27] it is no answer for the government to argue "that the [property owner's] takings claim must be dismissed for lack of jurisdiction because [it] had no intent to take the [owner's property], but rather only to assert the government's 'rights.'" *Porretto v. Patterson*, 251 S.W.3d 701, 709 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

Finally, requiring property owners to show that the government subjectively believed it had no right to take their property would eviscerate our constitutional bulwark against uncompensated takings.

> When a plaintiff alleges a state taking of property and title to that property is in dispute, the State cannot evade its constitutional obligations merely by asserting that it "believes" it is acting as landowner [or exercising other legal rights] rather than [exercising eminent-domain power] as sovereign regardless of whether that belief is, in fact, accurate. Otherwise, the State would be in the position of unilaterally determining the outcome of takings disputes simply by declaring a subjective belief—whether right or wrong—that it thought it owned [or had rights regarding] the property. Takings jurisprudence does not work this way.

*Koch*, 273 S.W.3d at 459.

Indeed, "if the government could claim immunity for a taking by simply asserting title [or other rights], then it need never legally condemn land—it 'could simply appropriate it, and the landowner would

---

[27] *See Labruzzo*, 144 Fed. Cl. at 474 n.13 ("Under either" an intentional taking or intentional conduct substantially certain to result in a taking, "the focus is on the nature of the government's [invasion], not the government's mindset about the permissibility of its [invasion].").

be entitled to no compensation unless the Legislature granted him permission to sue.'" *Porretto*, 251 S.W.3d at 708 (quoting *Griffin v. Hawn*, 341 S.W.2d 151, 153 (Tex. 1960)). And the government could bulldoze anyone's house without compensation simply by asserting a belief—even a wholly unsupported one—that it had the legal right to do so, regardless of whether that assertion was later withdrawn or disproved. These are the very depredations that Article I, Section 17 was adopted to guard the people of Texas against.

We conclude that the government may not avoid paying compensation for intentionally taking, damaging, destroying, or appropriating private property for public use by showing that it acted under the incorrect impression that it had a legal right to do so.[28] Because the Selfs have alleged and offered evidence of each required element of their claim for inverse condemnation, the court of appeals erred in dismissing that claim.

---

[28] We note that when TxDOT directed the destruction of the Selfs' trees, it had access to all the information it needed to determine that its easement rights did not extend to all those trees. An owner of property rights is presumed to know the boundaries of its property. *Garcia v. Palacios*, 667 S.W.2d 225, 231 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.); *Allen v. Robbins*, 347 S.W.2d 362, 366 (Tex. Civ. App.—Austin 1961, no writ); *see also City of Anson*, 216 S.W.3d at 393 ("The City's chain of title establishes that it was on actual notice of plaintiffs' ownership interest."). And the record shows TxDOT had a map at its local office showing the width of its right-of-way easement, which in any event was publicly recorded. In addition, TxDOT identifies no authority—and we have found none—suggesting that an easement holder is entitled to presume that a fence is located on the boundary line of its easement.

31

The Selfs' negligence cause of action against TxDOT is barred by sovereign immunity because neither of the two theories offered by the Selfs satisfies the waiver requirements of the Tort Claims Act. The Selfs have a viable cause of action for inverse condemnation, however, as they have raised a fact issue regarding whether TxDOT intentionally destroyed the trees on their property for public use. We therefore reverse the court of appeals' judgment, render judgment dismissing the Selfs' cause of action for negligence, and remand their cause of action for inverse condemnation to the trial court for further proceedings. *See* TEX. R. APP. P. 60.2(c), (d).

_____
J. Brett Busby
Justice

**OPINION DELIVERED:** May 17, 2024

32